E. A. Vaughey and Mary B. Vaughey, et al. [1] v. Commissioner. Vaughey v. Commissioner
Docket Nos. 1900-63 - 1905-63, 1935-63 - 1941-63, 3413-63, 3553-63.
United States Tax Court
T.C. Memo 1965-253; 1965 Tax Ct. Memo LEXIS 77; 24 T.C.M. (CCH) 1369; T.C.M. (RIA) 65253; September 20, 1965
*77 Held, the useful life, for computing depreciation, of petitioners' water distribution system was eight years. C. Delbert Hosemann, for the petitioners. Roger Rhodes, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: The respondent determined deficiencies in income tax for the calendar year 1959 in the following amounts: Docket No.
Petitioner
Amount
1937-63
E. A. Vaughey and Mary B.
Vaughey
$11,108.58
1900-63
Deposit Guaranty Bank and
Trust Company, Trustee
for Elizabeth Hayden Black-
burn Trust of March 8,
1952
214.97
1901-63
Deposit Guaranty Bank and
Trust Company, Trustee
for Patricia Vaughey Trust
of March 8, 1952
217.96
1902-63
Deposit Guaranty Bank and
Trust Company, Trustee
for William Meacher Vaug-
hey, Jr. Trust of March 8,
1952
217.96
1903-63
Deposit Guaranty Bank and
Trust Company, Trustee
for William Townsend
Blackburn, Jr. Trust of
March 8, 1952
214.97
1904-63
Jack D. Skinner
618.09
1905-63
W. M. Vaughey and Gene-
vieve C. Vaughey
8,501.09
1935-63
Deposit Guaranty Bank and
Trust Company, Trustee
for Mary Madden Black-
burn Trust of March 8, 1952
$ 214.97
1936-63
Deposit Guaranty Bank and
Trust Company, Trustee
for John Cowman Vaughey
Trust of March 8, 1952
217.96
1938-63
Deposit Guaranty Bank and
Trust Company, Trustee
for Genevieve Sandra
Vaughey Trust of March 8,
1952
217.96
1939-63
Clifford J. Hans and Irline C.
Hans
754.35
1940-63
Deposit Guaranty Bank and
Trust Company, Trustee
for Mary Byrnes Vaughey
Trust of March 8, 1952
1,626.95
1941-63
Deposit Guaranty Bank and
Trust Company, Trustee
for Emmett Vaughey Black-
burn Trust of March 8,
1952
214.97
3413-63
Robert L. Hoss and Elaine
Hoss
4,263.32
3553-63
W. T. Blackburn and Ros-
anna M. Blackburn
5,113.46
*78 The sole issue remaining for decision is what was the useful life, for purposes of computing depreciation, of a water distribution system constructed and operated by a partnership of which the petitioners were members. Findings of Fact Some of the facts have been stipulated and the stipulation, together with the exhibits attached thereto, is incorporated herein by this reference. The petitioners E. A. Vaughey and Mary B. Vaughey, Jack D. Skinner, W. M. Vaughey and Genevieve C. Vaughey, and Clifford J. Hans and Irline C. Hans resided in Jackson, Mississippi, and filed their Federal income tax returns for 1959 with the district director of internal revenue at Jackson, Mississippi. The petitioners Robert L. Hoss and Elaine Hoss, and W. T. Blackburn and Rosanna M. Blackburn resided in Denver, Colorado, and filed their Federal income tax returns for 1959 with the district director of internal revenue at Denver, Colorado. The Deposit Guaranty Bank and Trust Company, as Trustee, respectively, for the Elizabeth Hayden Blackburn Trust, the Patrica Vaughey Trust, the William Meacher Vaughey, Jr. Trust, the William Townsend Blackburn, Jr. Trust, the Mary Madden Blackburn Trust, the *79 John Cowman Vaughey Trust, the Genevieve Sandra Vaughey Trust, the Mary Byrnes Vaughey Trust, and the Emmett Vaughey Blackburn Trust, all of March 8, 1952, filed Federal income tax returns for each of such trusts for the taxable year 1959 with the district director of internal revenue at Jackson, Mississippi. The partnership, Vaughey, Blackburn and Vaughey, filed its partnership income return (Form 1065) for the year 1959 with the district director of internal revenue at Jackson, Mississippi. Petitioners are all members of the partnership Vaughey, Blackburn and Vaughey (hereinafter sometimes referred to as the partnership), formed January 1, 1958, to construct, operate, and maintain a water pipeline system in the State of Colorado to serve the oil industry in the conduct of oil and gas operations and water flood operations in the secondary recovery of oil and gas. Prior to January 1, 1958, there existed a partnership composed of E. A. Vaughey, W. M. Vaughey and W. T. Blackburn, operating under the name of Vaughey and Vaughey. All the water sales contracts and other documents hereinafter mentioned which were executed by Vaughey and Vaughey were assigned in due course to the partnership, *80 Vaughey, Blackburn and Vaughey. Prior to the taxable year 1959, Vaughey and Vaughey entered into seven water sales contracts with the operators of certain oil fields in Washington, Morgan, and Adams Counties in Colorado. Two other similar contracts with operators in Morgan and Washington Counties were entered into subsequent to 1959. Except for those nine, no other operators in the area entered into contracts with the partnership for various reasons attributable to their own operations, such as availability of water from shallow wells, recycling, and water drive. In each of these contracts, Vaughey and Vaughey, as seller, agreed to deliver to the specified oil field during the term of the contract the amount of water required by the operator, as buyer, up to and including certain specified maximum amounts. The buyer agreed to take or pay for a certain minimum number of barrels of water per month. In general, the contracts were to continue for a "primary term," commencing with the date seller was ready and able to deliver water, or until the total payments to be made by the buyer to the seller should equal the specific amount designated therein, sometimes referred to as the "period *81 of minimum take," and thereafter from year to year until cancelled. After the primary term or period of minimum take, the buyer was not obligated to take any specific quantity of water and could cancel the contract on 90 days' written notice to the seller. If, after the period of minimum take, the buyer failed to take any water for water flood purposes for a period of 12 months, the seller could cancel the contract upon 30 days' written notice to the buyer. Buyer agreed to pay seller at the rate of 4.8 cents per barrel of 42 gallons of water delivered or contracted for, provided further, however, that if, during the extended period of the contract, seller's actual cost exceeded the price buyer was then paying, upon notice of such fact by the seller, buyer was obligated to pay seller its actual cost of delivering water thereafter to buyer. In the latter event, four of the contracts (Nos. 2, 4, 6 and 8 of the schedule hereinafter set forth) provided that neither depreciation nor depletion was to be included in seller's cost of operations. In three of the contracts (Nos. 3, 5, and 7 of the schedule hereinafter set forth) the buyer could, if it so desired, take over the actual operation, *82 but in that event buyer was obligated to pay seller an amount equal to its monthly unrecovered depreciation not to exceed ten percent of the seller's total investment. The following is a schedule of the nine water sales contracts entered into, showing the name of the operator of the oil field, the date the contract was entered into, the oil field for which water was contracted, the maximum and minimum take, the primary term or period of minimum take, and the date the contracting operator began using water: Primary
Maximum
Minimum
Term
Take
Take
or Period
Began
Barrels
Barrels
of Mini-
Using
Operator
Date
Field
Per Day
Per Month
mum Take
Water
47 mos. or
1. Monsanto Chemical Co.
11/ 8/57
Little Beaver East
7,000
91,260
$201,600
9/19/58
2. Continental Oil Co.
11/18/57
Little Beaver
20,000
304,200
$705,000
10/19/58
3. Continental Oil Co. &
Others
2/10/58
Plum Bush Creek
10,000
150,000
$374,400
6/10/59
4. Sinclair Oil & Gas Co.
2/25/58
South Kejr
2,500
38,025
$ 86,400
9/19/58
5. Sohio Petroleum Co. &
57 mos. or
Others
4/ 7/58
Kejr
4,500
53,235
$141,000
6/ 6/59
6. Sinclair Oil & Gas Co.
4/ 8/58
Badger Creek
7,000
106,470
$230,400
9/19/58
7. Champlin Oil & Ref.
Co. & Others
7/29/58
Phegley
2,000
36,600
$103,680
10/ 6/59
8. Joseph L. Cramer &
12 mos. or
Others
6/28/60
Luster
1,500
22,916
$ 52,800
10/29/60
9. Monsanto Chemical Co.
2/21/61
Nugget
10,000
91,260
$ 50,000
4/14/61
*83 Prior to the execution of any of the contracts, Robert L. Hoss, an experienced grauduate petroleum engineer, made a study of the oil reserves of the various oil fields in the area to be served and estimated, by years, the water requirements the seven initial fields contracted for would need for the secondary recovery of oil. According to the forecast, prepared by Hoss in early 1957, two of the fields (South Kejr and Badger Creek) would require water for a period of six years, three (Little Beaver East, Kejr, and Phegley) for eight years, one (Plum Bush Creek) for eleven years, and one (Little Beaver) for twelve years. The total annual water requirements as so estimated were as follows: Year
Barrels
1
12,045,000
2
16,279,000
3
13,711,225
4
9,367,725
5
6,265,225
6
4,056,610
7
2,578,725
8
1,841,425
9
584,000
10
419,750
11
261,340
12
89,425
Total
67,499,450
Based upon Hoss' engineering report and an estimated cost of constructing and operating the proposed water pipeline and related facilities, E. L. Wehner, of Houston, Texas, who is a certified public accountant and a partner in the accounting firm of Arthur Andersen & Company, and who is *84 a person with wide experience in the accounting aspects of the oil, gas and pipeline business, made an economic analysis of the project to determine what the cash flow from the project might be, the means of financing, and the sales price that would have to be received to make it economically feasible, and prepared a twelve-year forecast of earnings. His report, dated May 15, 1957, used a sales price of 4.7 cents per barrel in computing earnings rather than the 4.8 cents later contracted for. According to Wehner's analysis, the cost of the water to be delivered would exceed the sales price of 4.7 (or 4.8) cents per barrel by the end of the eighth year and would be 7.54 cents for the ninth year, 10.5 cents for the tenth year, 16.8 cents for the eleventh year, and 49.27 cents for the twelfth year. These rates would make it increasingly uneconomical for the oil operators to purchase water for flooding operations after the eighth year. The water distribution system, consisting of the primary wells, a pumping station, approximately 49 miles of pipeline, meters and related facilities, was constructed by Vaughey and Vaughey in 1957 and 1958 and is presently being operated by the partnership. *85 The various operators contracted with began using water on the dates indicated in the above schedule. Six of the initial seven operators had paid out their minimum take within four years. All of the fields served by the water pipeline system, including the other one of the initial seven and the two additional ones contracted for, had reached and paid out their minimum take at the time of the trial, well within eight years after the commencement of operations. In accordance with the terms of the contracts permitting the buyer to cancel the contract on 90 days' notice to the seller after the contract term or "period of minimum take," the contracts for four of the fields have been terminated: Little Beaver on April 1, 1964; Little Beaver East on August 1, 1964; Phegley on September 1, 1964; and Badger Creek on September 8, 1964. In connection with his economic analysis and twelve-year forecast of operations, Wehner showed depreciation over a four-year period, computed on a unit of production basis, with a salvage value of $300,000. On its information return (Form 1065) for the year 1959, the partnership reported depreciation of the water distribution system by the double declining balance *86 method on the basis of an eight-year useful life. The petitioners claimed their respective distributive shares of this depreciation as a deduction on their Federal income tax returns for 1959. In the statutory notice of deficiency, respondent determined that the depreciation of the water distribution system should have been computed on the basis of a twelve-year useful life. The water pipeline would have a physical life in excess of twenty years if continued in use for that purpose. The other equipment, including pumps and appurtenant appliances, would have a physical life in excess of twelve years. The useful life of the water distribution system, for depreciation purposes, is eight years. Opinion The sole issue for decision is whether, for the purpose of computing depreciation, the useful life of the water distribution system was eight years, as contended by the petitioners, or twelve years, as determined by the respondent. There is no dispute as to the partnership's basis or the method of computation used. It is stipulated that the equipment involved would have a physical life in excess of twelve years if continued in use as a water distribution system. The term "useful *87 life" is defined in Income Tax Regulations, section 1.167(a)-1(b), which states that "the estimated useful life of an asset is not necessarily the useful life inherent in the asset, but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income." See, also, Massey Motors v. United States, 364 U.S. 92 (1960). Th physical life of the parts is not determinative. See Illinois Pipe Line Co., 37 B.T.A. 1070, 1080 (1938). The partnership made a study of the project before entering into any of the contracts. The estimates were to the effect that the largest quantity of water would be required in the first four years of the project for filling reservoirs in the various fields and that the amount used would diminish rapidly thereafter, with only moderate or insignificant amounts called for after the eighth year. The cost of producing and delivering the water to the oil operators was calculated carefully. It was estimated that the cost would exceed the contract price after the eighth year and if the operators were to be required to pay that increased *88 cost, as was contemplated and as the subsequent contracts provided, it would become increasingly uneconomical for the operators to purchase water after the eighth year. The pipeline and other equipment here involved were installed for the purpose of serving oil fields in a limited area by providing water for use in the secondary recovery of oil by flooding. When there is no further requirement of water for such use the equipment will have no further use in the partnership's business. The contracts with the seven original operators provided for a period of minimum take or fixed amount which approximated four years. This was to permit the partnership to recover its original investment in the project. After that point was reached, each operator could cancel on 90 days' notice. As the water requirements of the area served diminish, the cost per barrel to the partnership of producing the water will rise, and when this cost exceeds the contract price the operators are to pay the actual cost. The operators may in some cases take over the operation if the cost exceeds the contract price. And if the cost increases considerably, the operators may find it excessive in relation to the amount *89 of oil recoverable and will refuse to buy. The testimony is to the effect that some six barrels of water are required for injection to produce one barrel of oil, that the operators' own water resources would provide about three barrels of what was needed, and that the partnership was supplying the additional three barrels required from outside sources. Thus, the additional water may not be vital to the operators, who may recycle their own water or may conclude that the cost of recovering additional oil is prohibitive. The respondent admits that under the contracts and the provisions for increasing the price as the cost increases a point will be reached when it is no longer economically feasible for the operators to buy water, but says that the evidence does not prove that this point will be reached at the end of eight years. The respondent contends that since two of the original fields involved were estimated as requiring water for eleven or twelve years, it will be necessary for the partnership to use the water system in its business for twelve years since it is obligated to furnish water as long as the operators require it. The respondent contends also that the partnership *90 expected to enter into additional contracts with other operators in the area served by the water system and points out that since two such contracts were signed in 1960 and 1961 others might be made which will require continued use of the system after the eighth year. While the forecast made early in 1957 indicated that two of the original operators might require water for eleven or twelve years, the partnership at the end of 1959, after the first seven contracts were in effect, was in a position to make a more accurate estimate of the future use of the system. At that time the equipment had been in use for some fifteen months, the peak of greatest demand had already passed, and the attempts to secure additional users had proved unsuccessful, the larger operators in the area having water supplies sufficient for their needs. It seemed reasonable then to assume that in the cases of the two fields which might have a use for water after the eighth year, the increasing cost of furnishing it then would cause them to terminate their contracts. These considerations support the estimate adopted by the partnership in the tax returns for 1959 for computing depreciation on the basis of a useful *91 life of eight years. As stated in Massey Motors, supra (p. 105), "prediction is the very essence of depreciation accounting." The original estimate made in 1957 was based in part upon the hope that some of the major operators in the area would enter into contracts after the pipeline was built. This hope did not materialize. The major operators had water supplies of their own and one of them refused to buy, even though the pipeline crossed its field. Two contracts were secured in 1960 and 1961, but these were for comparatively small quantities. The failure to secure more such contracts will increase the probability that the amount of water wanted after the eighth year will be so small that the cost of it to the operators will be excessive. The actual experience of the project subsequent to 1959 confirms the reasonableness of the estimate made by the partnership at that time. The field which was originally estimated as requiring water for twelve years terminated its contract at the end of six years. Three other fields originally estimated as needing water for six to eight years terminated their use within six years. Although two new fields entered into contracts, these *92 were for comparatively small quantities. With only three of the original seven fields, plus the two newer ones, still taking water after six years, it now appears most likely that the amount of water which will be asked for after eight years will be insignificant and that the cost of supplying it will be prohibitive to the operators. The evidence supports the reasonableness of the petitioners' estimate, and we have found that the useful life of the system is eight years. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Deposit Guaranty Bank and Trust Company, Trustee for Elizabeth Hayden Blackburn, Trust of March 8, 1952, Docket No. 1900-63; Deposit Guaranty Bank and Trust Company, Trustee for Patricia Vaughey Trust of March 8, 1952, Docket No. 1901-63; Deposit Guaranty Bank and Trust Company, Trustee for William Meacher Vaughey, Jr. Trust of March 8, 1952, Docket No. 1902-63; Deposit Guaranty Bank and Trust Company, Trustee for William Townsend Blackburn, Jr. Trust of March 8, 1952, Docket No. 1903-63; Jack D. Skinner, Docket No. 1904-63; W. M. Vaughey and Genevieve C. Vaughey, Docket No. 1905-63; Deposit Guaranty Bank and Trust Company, Trustee for Mary Madden Blackburn Trust of March 8, 1952, Docket No. 1935-63; Deposit Guaranty Bank and Trust Company, Trustee for John Cowman Vaughey Trust of March 8, 1952, Docket No. 1936-63; Deposit Guaranty Bank and Trust Company, Trustee for Genevieve Sandra Vaughey Trust of March 8, 1952, Docket No. 1938-63; Clifford J. Hans and Irline C. Hans, Docket No. 1939-63; Deposit Guaranty Bank and Trust Company, Trustee for Mary Byrnes Vaughey Trust of March 8, 1952, Docket No. 1940-63; Deposit Guaranty Bank and Trust Company, Trustee for Emmett Vaughey Blackburn Trust of March 8, 1952, Docket No. 1941-63; Robert L. Hoss and Elaine Hoss, Docket No. 3413-63; and W. T. Blackburn and Rosanna M. Blackburn, Docket No. 3553-63.↩